**FILED**

MAY 1 9 2022

JEAN BURKETT-CIRCUIT CLERK
WOODRUFF COUNTY, AR
AT _____ 14:13P _____ M

## IN THE CIRCUIT COURT OF WOODRUFF COUNTY, ARKANSAS
## CIVIL DIVISION

| | |
|---|---|
| **MICHAEL WHITKANACK, on behalf of himself and all others similarly situated,** | Case No. CU-22-46 |
| **Plaintiff,** | **CLASS ACTION COMPLAINT** |
| **vs.** | |
| **ARCARE,** | |
| **Defendant.** | **JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Plaintiff Michael Whitkanack ("Plaintiff"), individually and on behalf of all others similarly situated, through the undersigned counsel, hereby alleges the following against defendant ARcare. Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges as follows:

### NATURE OF THE CASE

1.      Plaintiff brings this class action against Defendant for its failure to exercise reasonable care in securing and safeguarding individuals' sensitive personal data on a massive scale.

2.      On February 24, 2022, Defendant first learned that an unauthorized party gained access to its network (the "Data Breach"). Defendant ran an investigation through April of 2022 which determined that patients' personally identifiable information and protected health information was accessible to the unauthorized party. This highly sensitive information included

1

names, Social Security numbers, driver's license or state identification numbers, dates of birth, financial account information, medical treatment information, prescription information, medical diagnosis or condition information, and health insurance information (the "Private Information").

3.    Defendant operates medical facilities in Arkansas, Mississippi, and Kentucky that offer multi-specialty healthcare clinics,[1] and provides care to thousands of patients.  ARcare's status as a preeminent health organization that holds hundreds of thousands of patients' information meant that Defendant should have known how to prevent a data breach, and/or mitigate harm from such a breach.  Defendant had a heightened duty to protect Plaintiff's and other Class members' data.

4.    Defendant's security failures enabled the hackers to steal the Private Information of Plaintiff and other members of the Class—defined below.  These failures put Plaintiff's and other Class members' Private Information at a serious, immediate, and ongoing risk.  Additionally, Defendant's failures caused costs and expenses associated with the time spent and the loss of productivity from taking time to address and attempt to ameliorate the release of personal data, as well as emotional grief associated with constant monitoring of personal banking and credit accounts.  Mitigating and dealing with the actual and future consequences of the Data Breach has also created a number of future consequences for Plaintiff and Class members—including, as appropriate, reviewing records of fraudulent charges for services billed but not received, purchasing credit monitoring and identity theft protection services, the imposition of withdrawal and purchase limits on compromised accounts, initiating and monitoring credit freezes, the loss of property value of their personal information, and the stress, nuisance, and aggravation of dealing with all issues resulting from the Data Breach.

---

[1] ARcare, *Our Story*, https://www.arcare.net/our-story/ [hereinafter *ARcare*] (last visited May 11, 2022).

5.    The Data Breach was caused and enabled by Defendant's violation of its obligations to abide by best practices and industry standards concerning the security of patients' records and private information.  Defendant failed to comply with security standards and allowed its patients' Private Information to be compromised, which could have been prevented or mitigated after the Data Breach occurred.

6.    Accordingly, Plaintiff asserts claims for: negligence; breach of implied contract; unjust enrichment/quasi-contract; and breach of fiduciary duty, and seeks injunctive relief, monetary damages, statutory damages, as well as all other relief as authorized in equity or by law.

## JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction under the Arkansas Constitution.

8.    The Court has personal jurisdiction over the parties in this case.  Defendant conducts business in Arkansas and avails itself of the laws of the State to provide healthcare services to patients throughout Arkansas.

9.    Venue is proper in the Circuit Court of Woodruff County because ARcare's principal place of business is located in Woodruff County.

## PARTIES

### A.    Plaintiff Michael Whitkanack

10.    Plaintiff Michael Whitkanack is a resident of Rose Bud, Arkansas. Mr. Whitkanack was a patient at ARcare before the Data Breach. To receive services at ARcare, Plaintiff Whitkanack was required to disclose his PII, which was then entered into ARcares's database and maintained by Defendant.  In maintaining his information, Defendant expressly and impliedly promised to safeguard Plaintiff Whitkanack's PII.  Defendant, however, did not take proper care of Mr. Whitkanack's PII, leading to its exposure as a direct result of Defendant's inadequate

security measures.  In or about April of 2022, Plaintiff Whitkanack received a notification letter from Defendant alerting him to the fact of the Data Breach and that his information was accessed by cybercriminals, which information may have included his "date of birth, Social Security number, medical treatment information, prescription information, medical diagnosis or condition information, health insurance information, and name."

11.     The letter also offered one year of credit monitoring, which was and continues to be ineffective for Whitkanack and the other Class members.  Not only is twelve months of credit monitoring woefully insufficient considering the years-long impact the Data Breach will have on Mr. Whitkanack and the Class, but the credit monitoring would have required that Mr. Whitkanack share additional highly sensitive information with a third-party entity connected to Defendant and could not guarantee complete privacy of this highly sensitive information.

12.     In the months and years following the Data Breach, Mr. Whitkanack and the other Class members will experience a slew of harms because of Defendant's ineffective data security measures.  Some of these harms will include fraudulent charges, medical procedures ordered in patients' names without their permission, and targeted advertising without patient consent.

13.     Plaintiff Whitkanack greatly values his privacy, especially in receiving medical services, and would not have paid the amount that he did for services at ARcare if he had known that his information would be maintained using inadequate data security systems.

14.     Although Mr. Whitkanack is mitigating the harm done to him and his family because of the exposure of his Private Information, he is still unsure of the extent that he has been harmed because Defendant is unable to notify him of exactly what type of Private Information was compromised in the Data Breach.

**B.    Defendant**

15.    Defendant ARcare is a healthcare company that provides "primary care, behavioral health, pharmacies, community outreach programs, and other healthcare services.[2] ARcare's administrative headquarters are located at 117 South 2nd Street in Augusta, Arkansas 72006. ARcare's corporate policies and practices, including those used for data privacy, are established in, and emanate from, Arkansas.

## FACTS

16.    Defendant ARcare provides healthcare services to thousands of patients per year. As part of its services, ARcare stores a vast amount of its patients' Private Information. In doing so, Defendant was entrusted with, and obligated to safeguard and protect, the Private Information of Plaintiff and the Class in accordance with all applicable laws.

17.    On February 24, 2022, ARcare was alerted that an unauthorized third party gained access to its network. Despite sending out notification letters to patients, ARcare was unable to determine conclusively the extent of the information taken from its systems or how such information may have been used. ARcare posted the following notice on its website in April of 2022:[3]

### NOTICE OF DATA PRIVACY INCIDENT

> ARcare is notifying certain individuals of a recent data privacy incident that may impact the privacy of a limited amount of personal and/or medical information. ARcare is unaware of any misuse of individual information and is providing notice to potentially affected individuals out of an abundance of caution.

---

[2] *ARcare, supra* note 1.
[3] *Notice of Data Privacy Incident*, https://www.arcare.net/wp-content/themes/altitude-pro/security_notice.html (last accessed May 11, 2022) [hereinafter *Privacy Incident*].

**About the Incident**

On February 24, 2022, ARcare experienced a data security incident that impacted its computer systems and caused a temporary disruption to services. ARcare immediately worked to secure its systems and quickly commenced an investigation to confirm the nature and scope of the incident. On March 14, 2022, the investigation determined that an unauthorized actor may have accessed and/or acquired some sensitive data during a period of unauthorized access to ARcare's computer systems between January 18, 2022 and February 24, 2022. A thorough review of the contents of the affected data was subsequently performed to determine whether it contained any sensitive information and identify affected individuals. On April 4, 2022, ARcare concluded the review and determined that personal information relating to individuals was in affected files.

**What Information Was Involved?**

Though it varies by individual, the types of personal and/or medical information that may have been accessed or acquired by the unauthorized actor included: names, Social Security numbers, drivers license or state identification numbers, dates of birth, financial account information, medical treatment information, prescription information, medical diagnosis or condition information, and health insurance information. At this time, ARcare is unaware of any or actual or attempted misuse of the affected information as a result of this incident.

**What We Are Doing.**

ARcare treats its responsibility to safeguard information in its care as an utmost priority. As such, ARcare responded immediately to this incident and have been working diligently to provide you with an accurate and complete notice of the incident as soon as possible. As part of its ongoing commitment to the privacy and security of personal information in its care, ARcare is reviewing and updating existing policies and procedures relating to data protection and security. ARcare is also investigating additional security measures to mitigate any risk associated with this incident and to better prevent future similar incidents. On April 25, 2022, ARcare began providing notice of this incident to potentially impacted individuals and to regulators where required.

**What You Can Do.**

Although ARcare is unaware of the misuse of any personal information impacted by this incident, individuals are encouraged to remain vigilant against events of identity theft by reviewing account statements, explanation of benefits, and monitoring free credit reports for suspicious activity and to detect errors. Any suspicious activity should be reported to the appropriate insurance company, health care provider, or financial institution.

**For More Information**

Individuals seeking additional information regarding this incident can call ARcares dedicated, toll-free number at (833) 783-1354, available Monday through Friday from 8am to 8pm Central time. Individuals may also write to ARcare directly at: 117 S. 2nd Street, Augusta, Arkansas 72006. ARcare is committed to safeguarding personal information and will continue to work to enhance the protections in place to secure the information in its care.

## BEST PRACTICES

Although ARcare is unaware of any misuse of personal information as a result of this incident, individuals are encouraged to remain vigilant against incidents of identity theft and fraud, to review account statements, explanation of benefits, and to monitor credit reports for suspicious activity and to detect errors. Under U.S. law, a consumer is entitled to one free credit report annually from each of the three major credit reporting bureaus, Equifax, Experian, and TransUnion. To order your free credit report, visit www.annualcreditreport.com or call, toll-free, 1-877-322-8228. You may also directly contact the three major credit reporting bureaus listed below to request a free copy of your credit report.

Consumers have the right to place an initial or extended fraud alert on a credit file at no cost. An initial fraud alert is a one-year alert that is placed on a consumers credit file. Upon seeing a fraud alert display on a consumers credit file, a business is required to take steps to verify the consumers identity before extending new credit. If you are a victim of identity theft, you are entitled to an extended fraud alert, which is a fraud alert lasting seven years. Should you wish to place a fraud alert, please contact any one of the three major credit reporting bureaus listed below.

As an alternative to a fraud alert, consumers have the right to place a credit freeze on a credit report, which will prohibit a credit bureau from releasing information in the credit report without the consumers express authorization. The credit freeze is designed to prevent credit, loans, and services from being approved in your name without your consent. However, you should be aware that using a credit freeze to take control over who gets access to the personal and financial information in your credit report may delay, interfere with, or prohibit the timely approval of any subsequent request or application you make regarding a new loan, credit, mortgage, or any other account involving the extension of credit. Pursuant to federal law, you cannot be charged to place or lift a credit freeze on your credit report. To request a credit freeze, you will need to provide the following information:

1. Full name (including middle initial, as well as Jr., Sr., II, III, etc.);
2. Social Security number;
3. Date of birth;
4. Addresses for the prior two to five years;
5. Proof of current address, such as a current utility bill or telephone bill;
6. A legible photocopy of a government-issued identification card (state drivers license or ID card, etc.); and
7. A copy of either the police report, investigative report, or complaint to a law enforcement agency concerning identity theft if you are a victim of identity theft.

Should you wish to place a fraud alert or a credit freeze, please contact the three major credit reporting bureaus listed below . . .

18. The Data Breach exposed the Private Information of 345,353 individuals as reported to the United States Department of Health and Human Services.[4]

19. After Defendant investigated the Data Breach, it contacted its patients, noting that files accessed by the unauthorized third party included: "names, Social Security numbers, drivers license or state identification numbers, dates of birth, financial account information, medical

---

[4] *Cases Currently Under Investigation*, U.S. Dep't of Health & Human Servs.: Breach Portal, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf [hereinafter *Breach Portal*] (last visited May 11, 2022).

treatment information, prescription information, medical diagnosis or condition information, and health insurance information."[5]

20.    Defendant has yet to affirmatively notify impacted patients individually regarding what specific kind of data were stolen.

21.    The Data Breach occurred because Defendant failed to take reasonable measures to protect the Private Information it collected and stored.  Among other things, Defendant failed to implement data security measures designed to prevent this attack, despite repeated public warnings to the healthcare industry about the risk of cyberattacks and the highly publicized occurrence of many similar attacks in the recent past.  Defendant did not properly contain patient health data, which requires a heightened level of protection. Defendant failed to disclose to Plaintiff and Class members the material fact that it did not have adequate data security practices to safeguard customers' personal data, and in fact falsely represented that its security measures were sufficient to protect the Private Information in its possession.

22.    Had Plaintiff known that his data would be stored with improper security measures, he would have reevaluated what information he chose to provide to ARcare, which collects and stores the data of thousands of patients.

23.    Defendant's failure to provide immediate formal notice of the Breach to Plaintiff and Class members exacerbated the injuries resulting from the Data Breach.

---

[5] *Privacy Incident, supra* note 2.

A.     **Defendant Failed to Maintain Reasonable and Adequate Security Measures to Safeguard Patients' Private Information Despite Previous Data Breaches.**

24.     Defendant was aware of or should have been aware of the risk of data breaches in the healthcare industry, which has had well-publicized breaches from misuse or misconfigurations over the past four years.

25.     Defendant operates a major regional healthcare system, yet Defendant did not allocate adequate resources for cybersecurity protection of patient information.

26.     Under the Health Insurance Portability Act of 1996 ("HIPAA") Defendant had a heightened duty to protect patient Private Information.

27.     Defendant ARcare advertises itself as "assuring all members of the family are provided the absolute best in healthcare."[6]

28.     This type of advertising implies HIPAA compliance, although its improper security practices did not follow compliance.

29.     Defendant failed to ensure that proper data security safeguards were being implemented throughout the breach period.

30.     Defendant failed to ensure that its healthcare operations would not be impacted in case of a data breach.

31.     Defendant had obligations created by HIPAA, industry standards, common law, and representations made to Class members to keep Class members' Private Information confidential and to protect it from unauthorized access and disclosure.

32.     Plaintiff and Class members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant and any of its affiliates would

------

[6] *ARcare, supra* note 1.

comply with their obligations to keep such information confidential and secure from unauthorized access.

33.     Defendant's failure to provide adequate security measures to safeguard patients' Private Information is especially egregious because Defendant operates in a field which has recently been a frequent target of scammers attempting to fraudulently gain access to patients' highly confidential Private Information.

34.     Ponemon Institute, an expert in the annual state of cybersecurity, has indicated that healthcare institutions were the top target for cyber-attacks in 2020.[7]

35.     In fact, Defendant has been on notice for years that the medical industry is a prime target for scammers because of the amount of confidential patient information maintained. In 2019 alone, numerous entities in the healthcare sector suffered high-profile data breaches including Quest Diagnostics and LabCorp.

**B.     Defendant's Data Security and HIPAA Violations**

36.     Defendant's data security lapses demonstrate that it did not honor its duties to protect patient information by failing to:

i.       Maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

ii.      Adequately protect patients' Private Information;

iii.     Properly maintain its own data security systems for existing intrusions;

iv.      Ensure that it employed reasonable data security procedures;

v.       Ensure the confidentiality and integrity of electronic protected health

---

[7]     IBM Security, *Cost of a Breach Data* Report, PONEMON INST. 5 (2020), https://www.capita.com/sites/g/files/nginej291/files/2020-08/Ponemon-Global-Cost-of-Data-Breach-Study-2020.pdf.

information ("PHI") it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

vi.    Implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

vii.    Implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

viii.    Protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

ix.    Protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

x.    Ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4); and/or

xi.    Train all members of its workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b).

**C.**    **Damages to Plaintiff and the Class**

37.    Plaintiff and the Class have been damaged by the compromise of their Private Information in the Data Breach.

38.    The Private Information obtained by hackers and scammers is an extremely valuable commodity that is commonly traded on the black market and results in the diminishment

of the value of a person's electronic presence years into the future when it is misused.

39.     Plaintiff and the Class have experienced or currently face a substantial risk of out-of-pocket fraud losses such as loss of funds from bank accounts, fraudulent charges on credit cards, targeted advertising, suspicious phones calls, and similar identity theft.

40.     Plaintiff and Class members have also incurred out of pocket costs for protective measures such as credit freezing or payment for phone scam detection.

41.     Plaintiff and Class members suffered a loss of the property value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of the loss of the property value of personal information in data breach cases.

42.     Class members who paid Defendant for its services were also damaged via "benefit of the bargain" damages. Such members of the Class overpaid for a service that was intended to be accompanied by adequate data security—but was not. Part of the price Class members paid to Defendant was intended to be used by Defendant to fund adequate data security. Defendant did not properly comply with its data security obligations. Thus, the Class members did not get what they paid for.

43.     Members of the Class have spent and will continue to spend significant amounts of time to monitor their financial and medical accounts for misuse.

44.     According to the U.S. Department of Justice Bureau of Justice Statistics, an estimated 17.6 million people were victims of one or more incidents of identity theft in 2014.

45.     Similarly, the Federal Trade Commission (the "FTC") cautions that identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money,

and patience to resolve. Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[8]

46.     Identity thieves can use the victim's Private Information to commit any number of frauds, such as obtaining a job, loans, or even giving false information to police during an arrest. In the medical context, Private Information can be used to submit false insurance claims, obtain prescription drugs or medical devices for black-market resale, or get medical treatment in the victim's name. As a result, Plaintiff and Class members now face a real and continuing immediate risk of identity theft and other problems associated with the disclosure of their Social Security numbers and will need to monitor their credit and tax filings for an indefinite duration.

47.     Medical information is especially valuable to identity thieves. Because of its value, the medical industry has experienced disproportionally higher numbers of data theft events than other industries. Defendant knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

**D.     The Value of Privacy Protections and Private Information**

48.     The fact that Plaintiff's and Class members' Private Information was stolen—and might presently be offered for sale to cyber criminals—demonstrates the monetary value of the Private Information.

---

[8] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number[.]" *Id.*

49.    At an FTC public workshop in 2001, then–Commissioner Orson Swindle described

the value of a consumer's personal information:

> The use of third party information from public records, information
> aggregators and even competitors for marketing has become a major
> facilitator of our retail economy.  Even [Federal Reserve] Chairman
> [Alan] Greenspan suggested here some time ago that it's something
> on the order of the life blood, the free flow of information.[9]

50.    Commissioner Swindle's 2001 remarks are even more relevant today, as

consumers' personal data functions as a "new form of currency" that supports a $26 billion per

year online advertising industry in the United States.[10]

51.    The FTC has also recognized that consumer data is a new (and valuable) form of

currency.  In an FTC roundtable presentation, another former Commissioner, Pamela Jones

Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount
> of information collected by businesses, or why their information
> may be commercially valuable. Data is currency. The larger the data
> set, the greater potential for analysis—and profit.[11]

52.    Recognizing the high value that consumers place on their Private Information,

many companies now offer consumers an opportunity to sell this information.[12]  The idea is to

give consumers more power and control over the type of information that they share and who

---

[9] *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N
Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-
marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[10] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, THE WALL STREET JOURNAL (Feb. 28,
2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html [hereinafter *Web's New Hot Commodity*] (last visited Oct. 1, 2021).

[11] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*,
FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_
statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[12] *Web's Hot New Commodity*, *supra* note 10.

ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their Private Information. This business has created a new market for the sale and purchase of this valuable data.

53.     Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[13]

54.     At relevant times, Defendant was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud. Defendant should have particularly been aware of these risks given the significant number of data breaches affecting the medical industry.

55.     Had Defendant followed industry guidelines by adopting security measures recommended by experts in the field, Defendant would have prevented intrusion into its systems and, ultimately, the theft of its patients' Private Information.

56.     Given these facts, any institution that transacts business with patients and then allows the compromise of the privacy of its patients' Private Information due to its own negligent data security practices and procedures has thus deprived patients of the full monetary value of their transaction.

57.     Due to these resulting damages directly resulting from Defendant's negligent data security practices, Plaintiff and the other Class members did not receive the benefit of their bargain with Defendant and now face a greater risk of continuous identity theft.

---

[13] *Victims of Identity Theft, supra* note 13, at 7.

## CLASS ACTION ALLEGATIONS

58.    Plaintiff brings all counts, as set forth below, individually and as a class action, pursuant to the provisions of the Ark. R. Civ. P. 23, on behalf of a Nationwide Class defined as:

> All persons who had their Private Information submitted to Defendant or Defendant's affiliates and/or whose Private Information was compromised as a result of the data breach(es) discovered in February of 2022, (the "Nationwide Class").

59.    In addition to and/or in the alternative to claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of the following Arkansas subclass (the "Subclass"):

> All residents of Arkansas who had their Private Information submitted to Defendant or Defendant's affiliates and/or whose Private Information was compromised as a result of the data breach(es) discovered in February of 2022.

60.    The Nationwide Class and Arkansas Subclass are collectively defined herein as the "Class" or the "Classes."

61.    Excluded from both the Nationwide Class and the Subclass are Defendant and Defendant's affiliates, parents, subsidiaries, employees, officers, agents, and directors.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff, and Counsel for the Parties and the members of their immediate family.

62.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

**A.      Numerosity—Ark. R. Civ. P. 23(a)(1)**

63.    The members of the Class are so numerous that joinder of all Class members would be impracticable.  The Nationwide Class and Subclass both are expected to number in the hundreds of thousands.

**B.      Commonality— Ark. R. Civ. P. 23(a)(2)**

64.    Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the Class.  Such common questions of law or fact include, *inter alia*:

      i.    Whether Defendant's data security systems prior and during the Data Breach complied with applicable data security laws and regulations including, *inter alia*, HIPAA;

      ii.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

      iii.    Whether Defendant properly implemented its purported security measures to protect Plaintiff's and the Class's Private Information from unauthorized capture, dissemination, and misuse;

      iv.    Whether Defendant took reasonable measures to determine the extent of the Data Breach after it first learned about it;

      v.    Whether Defendant disclosed Plaintiff's and the Class's Private Information in violation of the understanding that the Private Information was being disclosed in confidence and should be maintained;

      vi.    Whether Defendant's conduct constitutes breach of an implied contract;

vii.   Whether Defendant willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiff's and the Class's Private Information;

viii.   Whether Defendant was unjustly enriched by its actions; and

ix.   Whether Plaintiff and the other members of the Class are entitled to damages, injunctive relief or other equitable relief, and the measure of such damages and relief.

**C.   Typicality—Ark. R. Civ. P. 23(a)(3).**

65.   Plaintiff's claims are typical of the claims of the other members of the Class because, *inter alia*, all Class members were similarly injured through Defendant's uniform misconduct described above and were thus all subject to the Data Breach alleged herein. Further, there are no defenses available to Defendant that are unique to Plaintiff.

**D.   Adequacy of Representation—Ark. R. Civ. P. 23(a)(4).**

66.   Plaintiff is an adequate representative of the Nationwide Class and Subclass because his interests do not conflict with the interests of the Classes he seeks to represent, he has retained counsel competent and experienced in class action litigation and will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

**F.   Superiority—Ark. R. Civ. P. 23(b).**

67.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that

would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct. Even if members of the Class could afford individual litigation, the court system cannot. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### Negligence
### (On Behalf of Plaintiff and the Nationwide Class or, Alternatively, Plaintiff and the Arkansas Subclass)

68.    Plaintiff fully incorporates by reference all of the above paragraphs, as though they are fully set forth herein.

69.    Upon Defendant accepting and storing the Private Information of Plaintiff and the Class in its computer systems and on its networks, Defendant undertook and owed a duty to Plaintiff and the Class to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. Defendant knew that the Private Information was private and confidential and should be protected as private and confidential.

70.    Defendant owed a duty of care not to subject Plaintiff and the Class's Private Information to an unreasonable risk of exposure and theft because Plaintiff and the Class were foreseeable and probable victims of any inadequate security practices.

71.    Defendant owed numerous duties to Plaintiff and the Class, including the following:

    i.      To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in its possession;

    ii.      To protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

    iii.      To implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

72.     Defendant also breached its duty to Plaintiff and Class members to adequately protect and safeguard Private Information by disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Private Information. Furthering its dilatory practices, Defendant failed to provide adequate supervision and oversight of the Private Information with which it was and is entrusted, despite the known risk and foreseeable likelihood of breach and misuse, which permitted a malicious third party to gather Plaintiff's and Class members' Private Information and potentially misuse the Private Information and intentionally disclose it to others without consent.

73.     Defendant knew, or should have known, of the risks inherent in collecting and storing Private Information and the importance of adequate security. Defendant knew or should have known about numerous well-publicized data breaches within the medical industry.

74.     Defendant knew, or should have known, that its data systems and networks did not adequately safeguard Plaintiff's and Class members' Private Information.

75.     Defendant breached its duties to Plaintiff and Class members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class members' Private Information.

76.     Because Defendant knew that a breach of its systems would damage thousands of its customers, including Plaintiff and Class members, Defendant had a duty to adequately protect its data systems and the Private Information contained thereon.

77.     Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations including but not limited to HIPAA, Ark. Code § 4-110-105, *et seq*, and common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class members from a data breach.

78.     Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

79.     Additionally, HIPAA requires that only authorized parties may access Private Information of an individual who has been deceased for less than 50 years. 45 C.F.R. § 160.103.

80.     In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

81.     Defendant had a duty under Arkansas Disclosure of Security Breaches law— Ark. Code § 4-110-105, *et seq*. to notify Plaintiff and Class members "expedient time and manner possible and without unreasonable delay." Defendant waited more than two months after it

experienced the security incident to notify affected patients.

82.    Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

83.    Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their Private Information.  Defendant's misconduct included failing to: (1) secure Plaintiff's and Class members' Private Information; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

84.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class members' Private Information, and by failing to provide timely notice of the Data Breach. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

     i.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;

     ii.    Failing to adequately monitor the security of Defendant's networks and systems;

     iii.    Allowing unauthorized access to Class members' Private Information; and

     iv.    Failing to timely notify Class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

85.    Through Defendant's acts and omissions described in this Complaint, including its failure to provide adequate security and its failure to protect Plaintiff's and Class members' Private

Information from being foreseeably captured, accessed, disseminated, stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiff's and Class members' Private Information during the time it was within Defendant's possession or control.

86.      Defendant's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to failing to adequately protect the Private Information and failing to provide Plaintiff and Class members with timely notice that their sensitive Private Information had been compromised.

87.      Neither Plaintiff nor the other Class members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

88.      As a direct and proximate cause of Defendant's conduct, Plaintiff and Class members suffered damages as alleged above.

89.      Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, *inter alia*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide lifetime free credit monitoring to all Class members.

**COUNT II**
**Breach of Implied Contract**
**(On Behalf of the Plaintiff and the Nationwide Class or, Alternatively, Plaintiff and the Arkansas Subclass)**

90.      Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

91.      Defendant, as a healthcare provider for the state of Arkansas, held information on behalf of Plaintiff.  Holding Plaintiff's and Class members' Private Information was part of Defendant's regular business practices.  When Plaintiff and Class members authorized healthcare

24

payments related to Defendant's services, their Private Information was stored in Defendant's network.

92.     In utilizing state healthcare options, Plaintiff and Class members entered implied contracts with Defendant which Defendant agreed to safeguard and protect such information and to timely detect any breaches of their Private Information. Plaintiff and Class members were required to share Private Information to obtain medical treatment. In entering such implied contracts, Plaintiff and Class members reasonably believed and expected that Defendant and its subsidiaries' data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

93.     Class members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

94.     Plaintiff and Class members fully performed their obligations under the implied contracts with Defendant.

95.     Defendant breached the implied contracts it made with Plaintiff and Class members by failing to safeguard and protect their Private Information and by failing to timely detect the data breach within a reasonable time.

96.     As a direct and proximate result of Defendant's breaches of the implied contracts between Defendant, Plaintiff, and Class members, Plaintiff and Class members sustained actual losses and damages as described in detail above.

97.     Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, *inter alia*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately

provide free lifetime credit monitoring to all Class members.

**COUNT III**
**Unjust Enrichment/Quasi-Contract**
**(On Behalf of the Plaintiff and the Nationwide Class or, Alternatively, Plaintiff and the Arkansas Subclass)**

98.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

99.    Plaintiff and Class members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and provided Defendant with their Private Information.  In exchange, Plaintiff and Class members should have received from Defendant the goods and services that were the subject of the transaction and should have been entitled to have Defendant protect their Private Information with adequate data security.

100.    Defendant knew that Plaintiff and Class members conferred a benefit on ARcare and has accepted or retained that benefit.  Defendant profited from Plaintiff's purchases and used Plaintiff's and Class members' Private Information for business purposes.

101.    Defendant failed to secure Plaintiff's and Class members' Private Information and, therefore, did not fully compensate Plaintiff and Class members for the value that their Private Information provided.

102.    Defendant acquired the Private Information through inequitable means as it failed to disclose the inadequate security practices previously alleged.

103.    If Plaintiff and Class members knew that Defendant would not secure their Private Information using adequate security, they would have made alternative healthcare choices that excluded Defendant.

104.    Plaintiff and Class members have no adequate remedy at law.

105.    Under the circumstances, it would be unjust for Defendant to be permitted to retain

any of the benefits that Plaintiff and Class members conferred on it.

106.    Defendant should be compelled to disgorge into a common fund or constructive

trust, for the benefit of Plaintiff and Class members, proceeds that it unjustly received from them.

In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class

members overpaid.

**COUNT IV**
**Breach of Fiduciary Duty**
**(On Behalf of the Plaintiff and the Nationwide Class or, Alternatively, Plaintiff and the**
**Arkansas Subclass)**

107.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully

set forth herein.

108.    Defendant had a fiduciary duty to safeguard patient Private information, which

included Plaintiff and Class members.

109.    Defendant breached this duty when it did not protect Plaintiff and Class members

Private Information.

110.    Defendant breached this duty when it did not provide adequate and timely

notification of the Data Breach to Plaintiff and Class members.

111.    Defendant breached its fiduciary duty when it violated 45 C.F.R. § 164.306(a)(1)

by failing to ensure the confidentiality and integrity of Plaintiff and Class Member's protected and

electronic health information that Defendant created, received, maintained, and transmitted.

112.    Defendant breached its fiduciary duty when it violated 45 C.F.R. § 164.312(a)(1)

by failing to implement technical policies and procedures for its electronic information systems

housing Private Information.

113.    Defendant breached its fiduciary duty when it violated 45 C.F.R. § 164.308(a)(1)

by failing to implement policies and procedures to prevent, detect, contain, and correct security

27

violations.

114.    Defendant breached its fiduciary duty when it violated 45 C.F.R. § 164.308(a)(6)(ii) by failing to mitigate, to the extent practicable, harmful effects of security incidents that were known to Defendant.

115.    Defendant breached its fiduciary duty when it violated 45 C.F.R. § 164.306(a)(2) by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic Private Information.

116.    Defendant breached its fiduciary duty when it violated 45 C.F.R. § 106.308(a)(6)(ii) by failing to mitigate harmful effects of security incidents known to Defendant.

117.    Defendant breached its fiduciary duty when it violated 45 C.F.R. § 164.306(a)(2) by failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic Private Information.

118.    Defendant violated 45 C.F.R. § 164.306(a)(3) when it failed to protect against reasonably anticipated uses or disclosures.

119.    Defendant breached its fiduciary duty when it violated 45 C.F.R. § 164.530(b), and 45 C.F.R. § 164.308(a)(5) by failing to ensure that its workforce complied with HIPAA and failing to provide adequate training to its workforce.

120.    Defendant breached its fiduciary duty when it violated 45 C.F.R. § 164.502 by impermissibly and improperly using and disclosing Private Information that remains accessible to unauthorized people.

121.    Defendant breached its fiduciary duty when it violated 45 C.F.R. § 164.530(c) by failing to design, implement, and enforce policies and procedures to establish a physical administrative safeguard to protect Private Information.

122.    Plaintiff and Class members face injuries as a direct and proximate result of Defendant's breaches of its fiduciary duties.  These injuries include, but are not limited to:

    i.    Loss of control over Private information;

    ii.    Compromise of Private Information;

    iii.    Lost opportunity costs associated with time spent to protect themselves and mitigate harm;

    iv.    Continued risk that Plaintiff and Class members Private Information could be stolen again;

    v.    Future costs associated with time spent protecting themselves from future harm;

    vi.    Diminished value of Defendant's services;

    vii.    Diminished value of Private Information;

    viii.    Anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## COUNT V
### Declaratory Relief

123.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

124.    This court is authorized under Ark. Code § 16-111-101, *et seq.*, to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the state statutes described in this Complaint.

125.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard

Plaintiff's and Class Members' PII, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their Private Information. Plaintiffs and the Class remain at imminent risk that further compromises of their PII will occur in the future.

126.    The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect consumers' PII.

127.    Defendant still possesses the PII of Plaintiff and the Class.

128.    Defendant has made no announcement that it has changed its data storage or security practices related to the PII.

129.    Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

130.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at ARcare. The risk of another data breach is real, immediate, and substantial.

131.    The hardship to Plaintiff and Class members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at ARcare, Plaintiffs and Class Members will likely continue to be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

132.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at ARcare,

thus eliminating the additional injuries that would result to Plaintiffs and Class Members, along with other consumers whose PII would be further compromised.

133.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that ARcare implement and maintain reasonable security measures, including but not limited to the following:

- Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on ARcare's systems on a periodic basis, and ordering ARcare to promptly correct any problems or issues detected by such third-party security auditors;

- engaging third-party security auditors and internal personnel to run automated security monitoring;

- auditing, testing, and training its security personnel regarding any new or modified procedures;

- purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

- conducting regular database scans and security checks; and

- routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully demands a jury trial of all issues so triable and requests that the Court enter judgment in their favor and against Defendant, as follows:

A.    Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiff as Class Representative, and appointing Class Counsel as requested in Plaintiff's expected motion for class certification;

B.    Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiff and the other members of the Class;

31

C.     Ordering injunctive relief requiring Defendant to, *inter alia*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide free credit monitoring to all Class members indefinitely;

D.     Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and their counsel;

E.     Ordering Defendant to pay equitable relief, in the form of disgorgement and restitution, and injunctive relief as may be appropriate;

F.     Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

G.     Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby requests trial by jury.

Date: May 1ᵗʰ, 2022                   Respectfully submitted,

Joseph Gates, AR Bar No. 2010239
**Gates Law Firm, PLLC**
6020 Ranch Blvd, Suite C-4, Office #3
Little Rock, AR 72223
Phone: (501) 779 8091
Gates@GatesLawPLLC.com

Nicholas A. Migliaccio (pro hac vice forthcoming)
Jason Rathod (pro hac vice forthcoming)
Tyler Bean (pro hac vice forthcoming)
Kevin Leddy (pro hac vice forthcoming)
**MIGLIACCIO & RATHOD, LLP**
412 H Street NE
Washington, D.C. 20002
202.470.3520
nmigliaccio@classlawdc.com